OPINION
 I. INTRODUCTION
This matter comes before the court for decision following a trial in the Regular Division. Plaintiff (taxpayer) argues that he is not liable for tobacco products taxes on "other tobacco products" (OTP) purchased from an unlicensed distributor during a period starting at the beginning of the third quarter of 2000 and running through the end of the fourth quarter of 2002. Taxpayer also argues that Defendant (the department) is equitably estopped from assessing tobacco products tax on purchases of OTP made from the same distributor during a period starting at the beginning of the first quarter of 1997 and running through the third quarter of *Page 2 
2005. Finally, taxpayer argues that the assessments made by the department should be dismissed as a sanction for spoliation of evidence.
 II. FACTS
On July 26, 2005, the department issued notices of tax assessment to taxpayer for unpaid tobacco products taxes arising from several hundred purchases of OTP taxpayer made from Lil Brown Smoke Shack (LBSS) between 1997 and 2004. (Def's Ex M.)[1] LBSS is located on the reservation of the Confederated Tribes of the Yakama Nation in the state of Washington and is not licensed as a distributor of tobacco products in Oregon. (Testimony of Fred Nichols, Trial, January 18, 2011, 2:07 [hereinafter Testimony of Fred Nichol].) LBSS did not pay tobacco products tax on the OTP sold to taxpayer. Taxpayer likewise did not pay tobacco products tax on the OTP taxpayer purchased from LBSS. (Testimony of William Downer, Trial, January 18, 2011, 1:12 [hereinafter Testimony of William Downer].)
Taxpayer began purchasing OTP from LBSS in 1997 for use as inventory at The Tobacco Leaf, a store that taxpayer owned in Mill City.[2] (Ptf's Compl at 2.) Taxpayer was diagnosed with cancer in early 2000. (Ptf's 1st Post-Trial Br at 3.) On May 2, 2000, taxpayer sold The Tobacco Leaf to Donald and Leta Bass (the 2000 buyers) using an installment sale contract.[3] *Page 3 
(Ptf's Ex 2.) Some time before January 2001, the 2000 buyers defaulted on their contractual obligations and taxpayer resumed operation of The Tobacco Leaf. (Statement of William Ghiorso, Trial, January 18, 2011, 10:12.)[4] Taxpayer then entered into a second, substantially similar installment sale contract with Michael Valvono (the 2001 buyer). (Def's Ex 3.) The 2001 buyer operated The Tobacco Leaf until he died of heart failure in mid-2002. (Testimony of William Downer at 11:41.) By that time taxpayer's cancer had gone into remission and taxpayer again resumed operation of The Tobacco Leaf. (Testimony of William Downer at 11:25.)
The 2000 buyers were unable to establish credit with LBSS. (Ptf's 1st Post-Trial Br at 2-3.) They therefore were unable to purchase OTP from LBSS on their own account.[5] Taxpayer testified that he agreed to purchase OTP from LBSS and other suppliers on behalf of the 2000 buyers. (Testimony of William Downer at 11:30.) He then provided the OTP to the 2000 buyers for use as inventory at The Tobacco Leaf. (Id.) His purpose in doing so was to enable the 2000 buyers to successfully run the store and continue making payments under the installment contract. (Id.) Taxpayer was reimbursed for these purchases of OTP, though the precise details regarding when and how he was reimbursed were not discussed at trial. (Testimony of William *Page 4 
Downer at 11:28.) This arrangement continued after the 2001 buyer purchased the store. (Id.)
In July of 2003, law enforcement officials representing several federal agencies and the states of Oregon and Washington executed a search warrant on the premises of LBSS. (Testimony of Fred Nichol at 1:37.) Information from business records seized from LBSS led to the identification of several customers of LBSS located in Oregon, including taxpayer. (Id.) Some time thereafter, the Oregon State Police (OSP) executed a search warrant at The Tobacco Leaf. (Id.) The OSP seized numerous business records from taxpayer, including taxpayer's invoices from LBSS and an uncertain number of copies of inspection reports filled out by inspectors sent by the department to enforce compliance with Oregon's cigarette and tobacco product taxes. (Testimony of William Downer at 11:34.) The department has entered into the record copies of some 470 invoices to taxpayer from LBSS. (Def's Ex A.)
The department has also entered into the record five inspection reports documenting inspections of The Tobacco Leaf by employees of the department. (Def's Ex E.) However, at trial the department conceded that an indeterminate number of additional inspection reports for The Tobacco Leaf had been lost or destroyed. (Statement of Joseph Laronge, Trial, January 18, 2011, 9:50.) No invoices, however, appear to have been lost or destroyed.
Following the raid by the OSP, the department made assessments against taxpayer for the unpaid tobacco products taxes for each quarter from the beginning of 1997 through the end of the second quarter of 2004. (Def's Ex M.) The assessments were calculated using invoices from LBSS to taxpayer, some of which were seized from taxpayer's store and others from LBSS. (Testimony of Fred Nichol at 1:41.) All of these invoices are in the record. The department also sought interest on the unpaid taxes and penalties for late filing. (Def's Ex M.) Taxpayer appealed the assessments, with the associated interest and penalties, to the Magistrate Division. *Page 5 
(Ptf's Compl at 4.) The Magistrate Division found against taxpayer and taxpayer then appealed to the Regular Division.
 III. ISSUE
Is taxpayer liable for tobacco products tax, interest, and penalties for OTP that taxpayer purchased from LBSS from the beginning of the first quarter of 1997 through the end of the third quarter of 2004?
 IV. ANALYSIS
A. Taxpayer's Liability for Tobacco Products Tax
The Tobacco Products Tax Act — ORS 323.500 to ORS 323.645 — imposes a tax on activities within the borders of Oregon relating to OTP.[6] ORS 323.505. The tax is collected from "distributors," as that term is defined by ORS 323.500. At all times at issue in this case, the statutory definition of "distributor" included, among other things:
 "Any person engaged in the business of selling tobacco products in this state who brings, or causes to be brought, into this state from without the state any tobacco products for sale."
ORS 323.500(3)(a) (1995); renumbered ORS 323.500(4)(a) (1997);renumbered ORS 323.500 (7)(a) (2003).[7] *Page 6 
"Distributors" become liable for the tax at the time the distributor engages in certain specified acts. ORS 323.505 (1). At all times at issue in this case those acts included, among other things:
 "Bring[ing], or caus[ing] to be brought, into this state from without the state tobacco products for sale, storage, use, or consumption."
ORS 323.505(1)(a) (1995-2001); renumbered as
ORS 323.500(6) (2003).
Taxpayer concedes that he purchased OTP from LBSS to use as inventory at The Tobacco Leaf on numerous occasions from the beginning of the first quarter of 1997 through the end of 1999 and from the first quarter of 2002 through the third quarter of 2004. (Testimony of William Downer at 11:44.) Taxpayer further concedes that he paid for OTP from LBSS from the beginning of the first quarter of 2000 through the third quarter of 2002 on behalf of the 2000 buyers and the 2001 buyer. (Testimony of William Downer at 11:30.) Finally, taxpayer concedes that neither he nor LBSS ever paid tobacco products tax for these purchases of OTP. (Testimony of William Downer at 1:12.) By the terms of ORS 323.505, these admissions on their own would result in taxpayer being liable at a minimum for tobacco products tax on all of the OTP from LBSS that taxpayer purchased while actually operating The Tobacco Leaf. For reasons discussed below, these admissions also result in taxpayer being liable for tobacco products tax for the OTP taxpayer paid for on behalf of the 2000 buyers and the 2001 buyer.
Nevertheless, taxpayer posits three arguments to reduce or eliminate his tobacco products tax liability:
 (1) That taxpayer is not liable for tobacco products tax for the purchases of OTP taxpayer made from LBSS from the beginning of the first quarter of 2000 through the end of the third quarter of 2002 because taxpayer was not a "distributor" during that time; *Page 7 
 (2) That the department is estopped from assessing tobacco products tax against taxpayer because the department misled taxpayer into believing that taxpayer, as a retailer of OTP, was not liable for tobacco products tax; and
 (3) That the department and/or the OSP lost or destroyed exculpatory evidence seized in the raid on taxpayer's store, and the assessments against taxpayer should be barred as a sanction for spoliation of evidence.
(Ptf's Trial Memo at 1, 2, and 5.) The court will address each of these arguments below.
1. Taxpayer's Liability for OTP Purchased from the Third Quarterof 2000 through the Fourth Quarter of 2002.
Taxpayer argues that he is not liable for the tobacco products tax on the OTP from LBSS that he paid for on behalf of the 2000 buyers and the 2001 buyer because he was not a "distributor" for purposes of the tobacco products tax. (Ptf's Trial Br at 1.) Taxpayer makes two arguments on this point. First, taxpayer contends that because he did not own The Tobacco Leaf during this period he was not "in the business" of selling tobacco products. (Id.) Second, taxpayer contends that because he was only paying for OTP on behalf of the 2000 buyers and the 2001 buyer, taxpayer did not "bring" OTP into the state or "cause [OTP] to be brought" into the state.
The court disagrees with taxpayer's first argument. For purposes of the tobacco products tax, "business" is defined as:
 "[A]ny trade, occupation, activity or enterprise engaged in for the purpose of selling or distributing tobacco products in this state."
ORS 323.500(1) (1995-2003). The question, then, is not whether taxpayer owned a business that sold OTP at the time taxpayer caused OTP to be brought within the borders of Oregon. Rather, *Page 8 
the question is whether taxpayer engaged in "any * * * activity" for the purpose of selling or otherwise distributing OTP in Oregon during the time in question.
The court finds that taxpayer did engage in such activity. At a minimum, taxpayer admits to paying for OTP during this period. (Testimony of William Downer at 11:30.) Taxpayer argues, however, that his purpose in paying for the OTP was not to sell or otherwise distribute it, but rather simply to facilitate the sale of The Tobacco Leaf. (Ptf's 1st Post-Trial Br at 3.) This argument is not well taken. For the purposes of the Tobacco Products Tax Act, "sale" is defined as:
 "any transfer, exchange or barter, in any manner or by any means, * * * for a consideration, and includes and means all sales made by any person."
ORS 323.500(7) (1995-1999); renumbered ORS 323.500(8) (2001);renumbered ORS 323.500 (11) (2003). Assuming that taxpayer's actions were primarily motivated by his desire to have the parties that purchased The Tobacco Leaf successfully continue to operate the store, "success" in this context necessarily meant selling the OTP paid for by taxpayer to customers of The Tobacco Leaf. For the buyers to sell the OTP to retail customers, they first had to acquire the right to possess and dispose of OTP that they did not themselves pay for. Those rights could only have come to the 2000 buyers and the 2001 buyer through a "transfer" by some "manner or means" from taxpayer. Moreover, it appears that taxpayer received "a consideration" for such transfers: at trial, taxpayer testified that one of the reasons that he agreed to pay for the OTP was that he was "in a much better position to collect [his] money" than was LBSS. (Testimony of William Downer at 11:28.) The court therefore finds that taxpayer paid for the OTP from LBSS with the intention of "selling" that OTP within the state of Oregon.
Taxpayer's argument that even though he was the one paying for the OTP, it was the 2000 buyers and the 2001 buyer who actually "caused" the OTP to be brought within the borders *Page 9 
of Oregon likewise fails. (Ptf's 1st Post-Trial Br at 3.) In interpreting statutory text, the court must "pursue the intention of the legislature if possible." ORS 174.020. To achieve this goal, Oregon courts first consider the text and context of the statute, giving words of common usage their "plain, natural and ordinary meaning." Portland General Electric Company v. Bureau of Labor andIndustries, 317 Or 606, 610-11, 859 P2d 1143 (1993). "Cause" is defined as, among other things:
 "A person, thing, fact, or condition that brings about an effect or that produces or calls forth a resultant action or state."
Webster's Third New Int'l Dictionary 356 (Unabridged ed 2002). Taxpayer testified that he agreed to pay for the OTP because LBSS would not sell to the parties to whom taxpayer had sold The Tobacco Leaf. (Testimony of William Downer at 11:27.) That is to say, the "fact" of taxpayer's agreeing to pay for the OTP "produce[d] or called forth" the continued shipment of OTP from LBSS on the Yakama reservation to The Tobacco Leaf in Mill City, Oregon. The court therefore finds that taxpayer did in fact "cause" the OTP purchased from LBSS to be brought within the boundaries of this state.[8]
Taxpayer remained "in the business" of selling tobacco products after selling The Tobacco Leaf to the 2000 buyers and then subsequently to the 2001 buyer. In the course of that business taxpayer "caused" OTP to be brought within the borders of this state. Consequently, taxpayer was a "distributor" of OTP during this period and is liable for the tax owed on the OTP that taxpayer purchased from LBSS during this period.
2. Equitable Estoppel
Taxpayer argues that the department is estopped from assessing tobacco products tax against taxpayer because taxpayer was supposedly misled regarding his responsibility for the tax *Page 10 
on OTP purchased from LBSS by statements contained in educational literature distributed by the department and by the conduct and representations of inspectors the department used to enforce the tobacco products tax and the cigarette tax.
Under normal circumstances, equitable estoppel requires each of the following:
 (1) A "false representation;"
 (2) Made by a party with knowledge of the facts;
 (3) To a party that is ignorant of the truth;
 (4) "With the intention that it should be acted upon" by the listener; and
 (5) Inducement of the listener to act on the statement.
Welch v. Washington County,314 Or 707, 715, 842 P2d 793 (1992) (quoting Coos County v. Stateof Oregon, 303 Or 173, 180-81, 734 P2d 1348 (1987)). However, additional limits on equitable estoppel apply in tax cases. Thus, in addition to the factors laid out above, to merit estoppel in this case taxpayer must also show the following:
 (1) "Proof positive" that the department misinformed taxpayer regarding his liability for tobacco products tax;
 (2) That taxpayer had "a particularly valid reason for relying on the misinformation; "and
 (3) "That it would be inequitable to a high degree" to require taxpayer to meet his actual tax liability.
Welch, 314 Or at 716 (quoting Johnson v. Tax Commission,248 Or 460, 435 P2d 302 (1967)). For the reasons discussed below, none of the statements cited by taxpayer, whether taken alone or together, satisfy the elements of a claim for equitable estoppel. *Page 11 
Taxpayer first argues that supposedly ambiguous statements made in a document distributed by the department, titled OregonCigarette Other Tobacco Products Tax, led taxpayer to conclude that he would not be liable for tobacco products tax on OTP purchased from LBSS. (Ptf's 1st Post-Trial Br at 5.) Taxpayer cites several passages in this document that taxpayer asserts are ambiguous because they draw a distinction between "retailers" and "distributors." These include the following:
 "As a retailer, your responsibility is to purchase tobacco products from a licensed distributor. The Distributor pays the tax."
(Id.) Taxpayer argues that he understood himself to be a "retailer" as that term is commonly understood, and did not realize that for purposes of the Tobacco Products Tax Act a person could be both a "retailer" in the colloquial sense and a "distributor" for purposes of the tobacco products tax. (Id. at 6-7.)
Taxpayer rightly asserts that an ambiguous statement by a government agency can form the basis of a claim for equitable estoppel. (Ptf's 1st Post-Trial Br at 4.) See Pilgrim TurkeyPackers v. Dept. of Rev.,261 Or 305, 308-10, 493 P2d 1372 (1972). However, even assuming some ambiguity in the passages cited by taxpayer, to prevail in his claim for equitable estoppel taxpayer must establish the existence of all of the elements of that claim. This he has not done. Specifically, taxpayer has failed to show that he relied on the supposedly ambiguous statements discussed above.
As an initial matter, the revision date on the first page of the copy of Oregon Cigarette Other Tobacco Products Tax
that taxpayer entered in evidence indicates that the department promulgated Oregon Cigarette Other Tobacco Products Tax in December 2002, roughly five years after taxpayer began purchasing OTP from LBSS. (Ptf's Ex 4 at 1.) Therefore, with respect to the years 1997 through 2002, taxpayer cannot reasonably claim to have been relying *Page 12 
on statements contained in that document. It is, of course, possible that taxpayer relied on the distinction between "retailers" and "distributors" in that document when he continued purchasing OTP from LBSS after receiving that document, but based on taxpayer's conduct and testimony this seems unlikely.
Taxpayer's argument that he relied on supposedly ambiguous statements in Oregon Cigarette Other Tobacco Products Tax is particularly belied by the fact that taxpayer, by his own admission, ignored that document's clear instruction to retailers "to purchase tobacco products from a licensed distributor." (Testimony of William Downer at 1:10.) Indeed, taxpayer testified that he never inquired into whether LBSS was licensed to distribute OTP in Oregon or paid tax on OTP sold in Oregon. (Id.) The magnitude of this oversight by taxpayer, if it was indeed an oversight, is highlighted by the fact that many of the LBSS invoices in the record clearly state that LBSS did not pay state or local taxes. (See Def's Ex A at 205, 329-469.)
The court finds that even if the passages in the Tobacco Products Tax section of Oregon Cigarette and Other Tobacco ProductsTax that taxpayer cites are ambiguous in context, taxpayer clearly did not rely in any meaningful way on the text of that document.
Taxpayer next argues that the conduct of and representations made by the department's inspectors misled taxpayer into believing that his business practices were in compliance with the Tobacco Products Tax Act. Specifically, taxpayer argues that — with minor exceptions — the department's inspectors only ever found taxpayer to be in compliance with Oregon law and that the department's inspectors never raised any objections to purchasing OTP from from LBSS. (Ptf's 1st Post-Trial Br at 6.)
The court's analysis of this argument is complicated by the fact that "one or more" of the reports from the department's inspections of taxpayer's business are not now available. *Page 13 
(Statement of Joseph Laronge, Trial, January 18, 2011, 9:50.) However, the inspection reports that have been entered in evidence do indicate that the department's inspectors found taxpayer to be in general compliance with Oregon law.[9] On the admitted facts in this case, these findings by the department's inspectors were "false," at least with respect to the OTP taxpayer purchased from LBSS. This satisfies the first element of a claim for estoppel as laid out in Welch.
However, on the record before the court there is no evidence that the department's inspectors made these statements with knowledge of the fact that taxpayer had purchased OTP from LBSS. Taxpayer presented testimony that the inspectors had access to the invoices from LBSS. (Testimony of Vonda Porter, Trial, January 18, 2011, 11:07.) However, none of the inspection reports in evidence indicate that inspectors ever actually saw invoices from LBSS in the course of their inspections. This is true even with respect to reports documenting inspections that took place shortly after the shipping dates recorded on invoices for OTP from LBSS. For example, one of the inspection reports in the record documents an inspection occurring on March 18, 2004. (Def's Ex A at 7.) Also in the record are invoices for purchases of OTP from LBSS that shipped on March 2, March 9, and March 15, 2004. (Def's Ex A at 368, 367, 366.) However, LBSS is not listed on the inspection report as a distributor whose invoices taxpayer provided to the inspector. (Def's Ex E at 7.) The same is true of an inspection report dated May 19, 2004. (Def's Ex E at 29.) This inspection report fails to list LBSS as a distributor whose invoices the department's inspectors encountered despite invoices in evidence with shipping dates on April 28, May 6, and May 12, 2004. (Def's Ex A at 360, 359, 358.) *Page 14 
Taxpayer presented testimony that taxpayer's invoices for OTP were kept in chronological order in a binder behind his counter. (Testimony of Vonda Porter, Trial, January 18, 2011, 11:04.) If that is true, then on each of the occasions discussed above the LBSS invoices should have been among the first that the department's inspectors would have come across. The fact that they are not listed is not in and of itself proof that the department's inspectors did not know of the purchases of OTP from LBSS. However, for taxpayer to succeed on his theory of estoppel, he must show by at least a preponderance of the evidence that the inspectors knew of these purchases. Despite the absence of some of the inspection reports, the fact that LBSS invoices were not documented on inspection reports that logically should have documented the presence of LBSS invoices weighs heavily on this question.
Moreover, even if the inspectors indicated taxpayer's general compliance with the tobacco products tax despite knowledge of taxpayer's purchases from LBSS, taxpayer must also show that he had "a particularly valid reason" for relying on the judgment of these inspectors. Welch, 314 Or at 716. Taxpayer's testimony does him more harm than good on this question. Taxpayer testified that in his opinion the inspectors he interacted with were "not very knowledgeable" and "didn't know what [they] were doing." (Testimony of William Downer at 11:32.) While it might seem odd to place the onus on taxpayer to look beyond the judgment of the department's inspectors once told he was in compliance with the law, taxpayer's testimony tends to establish that taxpayer had positive reasons not to rely on the judgments of the inspectors.
There is no evidence in the record that taxpayer relied on the supposedly ambiguous statements contained in the educational materials distributed by the department. Taxpayer has also failed to show that the department's inspectors had knowledge of taxpayer's purchases from *Page 15 
LBSS when they indicated his general compliance with the tobacco products tax. Finally, if taxpayer found the department's inspectors lacking in training and competence, he cannot be said to have had a "particularly valid reason" to rely on those selfsame inspectors' judgments as to his compliance with the Tobacco Products Tax Act. Taxpayer therefore fails to make out a case for equitable estoppel.
3. Spoliation of Evidence.
Finally, taxpayer argues that the court should strike the assessments of tobacco product tax against taxpayer as a sanction for causing or permitting the spoliation of evidence. (Ptf's Trial Memo at 5.) Taxpayer argues that the OSP seized no fewer than thirty, and as many as sixty, inspection reports and that only five were ever returned to taxpayer. (Testimony of William Downer at 11:35.) These reports, taxpayer contends, would have buttressed taxpayer's argument for equitable estoppel. (Ptf's 1st Post-Trial Br at 8.) Taxpayer further argues that the reports contain unspecified "additional material facts" that would have relieved taxpayer of his liability for the tobacco products tax on the OTP that taxpayer purchased from LBSS. (Id. at 7.)
The department concedes that "one or more" of the inspection reports were lost by either the department or the OSP. (Statement of Joseph Laronge, Trial, January 18, 2011 at 9:50.) However, the department disputes the number of inspection reports that were seized and subsequently lost. The department's witness Fred Nichol testified that the department's records indicated that taxpayer had been inspected only "eight or nine" times between 2000, when the department began inspecting retailers to ensure compliance with the tobacco products tax, and the end of 2004. (Testimony of Fred Nichol at 2:11.) However, Nichol also testified that the five inspection reports provided to taxpayer are all that the department was able to locate. (Id.) *Page 16 
Regardless of whether the number lost was four or fifty-five, the court is concerned by the fact that documents seized by the OSP for potential use in the criminal prosecution of taxpayer were not made available to taxpayer when requested for this proceeding. Given the uncontested facts in this case, however, the court cannot conceive how taxpayer was materially prejudiced in this proceeding by the failure of the department to produce the lost inspection reports.
Taxpayer has admitted to engaging in conduct that, for reasons discussed above, subjects him to tax liability under ORS 323.505. Taxpayer argues, however, that the missing reports would have bolstered his argument for estoppel because they provide further evidence that the department's inspectors misled taxpayer by wrongly indicating that taxpayer was in "general compliance" with tobacco products tax requirements. (Ptf's 1st Post-Trial Br at 8.) The court has already held in section IV(A)(2)(b) above that the mere failure by the department's inspectors to recognize noncompliance with ORS 323.505, without satisfying the other elements of a claim for equitable estoppel, does not merit estoppel on the record before the court.[10] Further evidence of the department's failure to recognize taxpayer's noncompliance would therefore be of no use to taxpayer. In addition, while the "additional material facts" that taxpayer alleges the reports contain could possibly be of assistance to taxpayer in this proceeding, the court is not prepared to rule in taxpayer's favor based solely on taxpayer's nonspecific, uncorroborated assertion.
Because the court finds that taxpayer was most likely not materially prejudiced in this proceeding by the department's failure to produce all of the inspection reports, the court declines *Page 17 
to strike the assessments against taxpayer as a sanction for the loss or destruction of the copies of the inspection reports seized from taxpayer's store.
B. The amount, if any, of the penalty for late filing.
ORS 305.992 permits the department to levy a penalty equal to 100 percent of the tax owed when "any returns required to be filed under ORS Chapter * * * 323 * * * are not filed for three consecutive years by the due date (including extensions) of the return required for the third consecutive year."
ORS 323.510(1) (1995-2003) requires distributors of OTP to submit tobacco product tax payments for the preceding quarter to the department "on or before the last day of January, April, July and October of each year." Each payment is to be accompanied by a return. ORS 323.510 (2) (1995-2003). Taxpayer began purchasing OTP from LBSS at the beginning of January 1997. Taxpayer's first quarterly payment, with accompanying return, was therefore due to the department on or before April 30, 1997. The due date of the "return required for the third consecutive year" was therefore Monday, May 1, 2000.[11] There is no evidence in the record that taxpayer has ever submitted the returns required by ORS 323.510(2) (1999-2003). Taxpayer is therefore liable in each quarter from the first quarter of 1997 through the third quarter of 2004 for the 100 percent penalty under ORS 305.992 (2003).
 V. CONCLUSION
From the first quarter of 1997 through the second quarter of 2004 taxpayer engaged in multiple purchases of untaxed OTP from LBSS. Taxpayer caused said OTP to be brought within the boundaries of Oregon for the purposes of selling it at The Tobacco Leaf. *Page 18 
Now, therefore,
IT IS DECIDED that taxpayer is liable for the tobacco products tax on all of the OTP taxpayer purchased from LBSS, with interest and penalties.
Dated this ___ day of May, 2011.
THIS DOCUMENT WAS SIGNED BY JUDGE HENRY C. BREITHAUPTON MAY 24, 2011, AND FILED THE SAME DAY. THIS IS A PUBLISHEDDOCUMENT.
[1] The department originally issued notices of assessment for the unpaid tobacco taxes to taxpayer on July 25, 2005. The department issued amended notices of assessments on July 26, 2005 because the notices issued on July 25 misstated the amounts of the penalties sought by the department. (Testimony of Fred Nichol, Trial, January 18, 2011, 1:43.)
[2] The parties stipulated at trial that taxpayer operated The Tobacco Leaf as a sole proprietorship.
[3] Under the terms of the contract, the 2000 buyers obtained possession of The Tobacco Leaf after making an initial payment of $30,000 to taxpayer. The 2000 buyers were then supposed to make monthly payments of at least $1,500 to taxpayer. These payments were to be applied to the total purchase price of $168,900. The full purchase price was to be paid by May 1, 2015. (Ptf's Ex 2.)
[4] In lieu of calling taxpayer's spouse as a witness, taxpayer's counsel provided an oral summary of the testimony that he intended to elicit from taxpayer's spouse. Counsel for the department stipulated to the broad factual outline presented by taxpayer's counsel regarding the circumstances of taxpayer's sales of The Tobacco Leaf.
[5] At trial taxpayer's counsel appeared to state that taxpayer did not pay for OTP while the 2000 buyers operated The Tobacco Leaf, but did do so during the tenure of the 2001 buyer. (Statement of William Ghiorso, Trial, January 18, 2011, 10:11.) However, there are several invoices in the record with dates falling during the time that the 2000 buyers operated The Tobacco Leaf. (Def's Ex A at 120-128.) These show sales of OTP to taxpayer's spouse with delivery to her place of employment in Gates. (Id.) At trial taxpayer testified that this was the protocol he followed when he was required to pay for shipments but was not available to personally make over a check at the time of delivery. (Testimony of William Downer at 10:17.) In any event, taxpayer does not argue that such shipments of OTP should be imputed to his spouse, rather than to himself. The court therefore concludes that taxpayer paid for shipments of OTP from LBSS while both the 2000 buyers and the 2001 buyer operated The Tobacco Leaf.
[6] Unless otherwise indicated, all references to the Oregon Revised Statutes (ORS) are to the 2009 edition.
[7] Until January 1, 2004, ORS 323.505(1) imposed a tax on the "sale, storage, use, consumption, handling or distribution" of OTP. Tax liability was triggered when distributors engaged in activities listed at formerORS 323.505(1)(a) to (c). Or Laws 2003, chapter 804, § 31 incorporated the activities listed at formerORS 323.505(1)(a) to (c) into the definition of "distribution" found at ORS 323.500(6) (2003). Or Laws 2003, chapter 804, § 32 replaced the phrase "sale, storage, use, consumption, handling or distribution" informerORS 323.505 (1) with the term "distribution." Hence, from January 2004 onward ORS 323.505(1) imposed a tax on the "distribution" of OTP, with "distribution" defined so as to include all of the activities resulting in tax liability enumerated informerORS 323.505(1)(a) to (c). These cosmetic changes to the Tobacco Products Tax Act do not affect the court's analysis of taxpayer's liability for tobacco products tax.
[8] This is not to say that other parties did not also "cause" the OTP in question to be brought into Oregon.
[9] Two of the reports, one dated March 18, 2004, and another dated May 19, 2004, do indicate that the department seized cigarettes from taxpayer's store due to problems involving tax stamps. However, the written comments of the inspectors in each case indicate that fault most likely lay with the licensed distributors that taxpayer bought to cigarettes from. (Def's Ex E at 7, 29.) Each of the inspection reports indicates that taxpayer provided invoices for OTP during the inspection that each report documents. (Def's Ex E at 4, 7, 29, 39.)
[10] The court does not understand taxpayer to argue that the missing inspection reports document the presence of invoices from LBSS among the business recordss reviewed by the department's inspectors.
[11] April 30, 2000 fell on a Sunday. Pursuant to ORS 323.500(2) (1999), when the due date of a writing or remittance to the department falls on a Saturday, Sunday, or legal holiday, the period to file is extended to include the next business day.